UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY S. MARTIN,

    Plaintiff

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

_____/

Civil Action No. 17-12707

HON. AVERN COHN
U.S. District Judge
HON. R. STEVEN WHALEN
U.S. Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Kimberly S. Martin ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #14] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

## PROCEDURAL HISTORY

On August 6, 2014, Plaintiff filed an application for DIB, alleging disability as of March 30, 2003 (Tr. 137-140). After the initial denial of the claim, Plaintiff filed a request for an administrative hearing, held on March 16, 2016 in Flint, Michigan before Administrative Law Judge ("ALJ") Kevin W. Fallis (Tr. 40). Plaintiff, represented by

-1-

Attorney Aaron Lemmon, testified (Tr. 43-59), as did Vocational Expert ("VE") Stephanee A. Leech[1] (Tr. 20, 60-64).  On June 28, 2016, ALJ Fallis found Plaintiff was not disabled on or before the date last insured for DIB benefits of March 31, 2009 (Tr. 34).  On June 27, 2017, the Appeals Council denied review (Tr. 1-6).  Plaintiff filed for judicial review of the final decision in this Court on August 17, 2017.

## BACKGROUND FACTS

Plaintiff, born October 21, 1957, was 51 on the date last insured for DIB ("DLI") of March 31, 2009 (Tr. 34, 137).  She completed 12th grade and worked previously as a fork truck driver (Tr. 164).  She alleges disability as a result of a back condition (Tr. 163).

### A. Plaintiff's Testimony

*The ALJ prefaced Plaintiff's testimony by noting a prior ALJ's non-disability decision of March 26, 2007*  (Tr. 43).  *He then directed Plaintiff to answer the questions regarding her condition for the period between March 30, 2003 and March 31, 2009* (Tr. 47).

Plaintiff then offered the following testimony:

After first injuring her back, she experienced "extreme, excruciating pain" that radiated into her left leg and foot (Tr. 47).  At that time she was able to walk only by dragging her left leg (Tr. 47).  She was also unable to bend, sit, twist, or turn (Tr. 47).  On a scale of one to ten, she experienced level "ten" pain (Tr. 47).  At that time, she was unable to cook, stand, or clean and experienced difficulty driving (Tr. 48).  She was able to do the dishes (Tr. 55).  She did not perform outdoor chores, take trips, or engage in hobbies (Tr. 55).  She coped with the condition by using hot and cold packs, elevating the legs, and taking Motrin and Vicodin, adding that she quickly stopped taking Vicodin due to the side effect

---

[1]The VE's name was misspelled by the hearing transcriber but is correctly spelled in the ALJ's determination (Tr. 20).

of disorientation (Tr. 48). She declined to take a muscle relaxant due to the side effect of heart palpitations (Tr. 54). Physical therapy did not improve her condition (Tr. 48). She coped with the pain by lying on the floor and resting her feet on the couch (Tr. 49). She experienced difficulty reaching forward (Tr. 49). Her ability to sit ranged from only 10 to 60 minutes (Tr. 49). She was unable to stand for more than 10 minutes or walk for more than 40 (Tr. 49-50, 58). She was unable to lift more than five pounds (Tr. 50). The back pain caused sleep disturbances (Tr. 50-51). Her weight at the time was around 127 pounds (Tr. 52). Her back injury resulted in a 2004 award of Workers' Compensation benefits (Tr. 52-53). She took a settlement amount of $150,000 in 2014 (Tr. 53). Before ceasing work in March, 2003, she worked as a truck driver for GM (Tr. 53).

Since the relevant period, her condition had gradually improved but she did not lift anything(Tr. 56-57, 59). She no longer experienced problems sitting (Tr. 58). Even at present, she did not perform outdoor work or strenuous cleaning chores, but was able to cook and shop (Tr. 58-59). She denied any psychological limitations (Tr. 59).

### B.  Medical Evidence[2]

#### 1. Records Related to Plaintiff's Treatment

In November, 2002, Kelvin Callaway, M.D. (Plaintiff's treating provider at least as far back as July, 2000) noted that Plaintiff, currently off work due to panic attacks, "had a panic attack" during the examination (Tr. 226). He noted that "obviously she cannot work until her anxiety and panic attacks are under better control" (Tr. 226). The following month, he found that Plaintiff should not be lifting more than 10 pounds or working more than eight

---

[2] Records predating and post-dating the relevant period (March 30, 2003 through March 31, 2009 are included for background purposes only.

hours a day due to cardiac arrhythmia (Tr. 214).

February, 2003 workplace medical records note that Plaintiff reported feeling dizzy (Tr. 353). In April, 2003, Dr. Callaway noted that Plaintiff continued to report radiating low back pain (Tr. 213). In May, 2003, Dr. Callaway noted that while Plaintiff still walked with a limp, he cleared her to return to work on May 19, 2003 (Tr. 213). Plaintiff declined a recommendation for a nerve block, noting that she wanted to finish physical therapy (Tr. 213). Physical therapy records from the same month and June, 2003 note "steady progress" (Tr. 294-295). A June, 2003 MRI of the lumbar spine showed a disc herniation causing nerve root impingement at L5-S1 (Tr. 215, 286, 399). In July, 2003, Dr. Callaway reviewed the MRI, ordering Plaintiff off work until after an August, 2003 neurological evaluation (Tr. 212, 366). Dr. Callaway's notes from the following month note Plaintiff's report of back pain since the previous February (Tr. 211).

In August, 2003, neurosurgeon Avery M. Jackson, III, M.D. noted 4/5 motor strength in the left knee extension but otherwise 5/5 strength in the lower extremities (Tr. 221). He noted limitations in deep tendon reflexes in the Achilles and patellar (Tr. 221). He observed that gait and station were "within normal limits" and noted a good range of back motion (Tr. 221). Dr. Jackson recommended physical therapy and steroid injections, and noted that Plaintiff could "ultimately require an L5-S1 microdiscectomy (Tr. 222). He later opined that "a microdis[c]ectomy would be very helpful for her and would get her back to work" (Tr. 223). Plaintiff told him that she would "think about surgery" but did "really [did] not want to go back to the type of work that she was doing . . . ." (Tr. 223).

In September, 2003, neurologist Jeffrey R. Levin, M.D. noted that Plaintiff had last worked on February 27, 2003 (Tr. 216). Plaintiff reported an improvement in back pain since being off work (Tr. 216). Dr. Levin diagnosed her with L5-S1 radiculopathy (Tr. 217).

Dr. Levin noted that Plaintiff had been given a previous recommendation for surgery and "suspect[ed] that she could be a surgical candidate" (Tr. 217). He noted that she was "very reluctant to have surgery" (Tr. 217). Dr. Levin recommended physical therapy and to stay off work for "several more weeks" to see if surgery were required (Tr. 217). He found that Plaintiff was "totally disabled" from work between September 3, 2003 and January 30, 2004 (Tr. 368). Physical therapy discharge records from the following month note Plaintiff's report of "minimal progress" in the back treatment (Tr. 290). Dr. Callaway's November, 2003 records state that Plaintiff reported "problems with her back and lumbar pain" (Tr. 211).

### 2. Non-Treating Records

In January, 2003, S. Fenton, M.D. performed an independent psychiatric examination on behalf of GM, noting Plaintiff's history of an anxiety attack at work when her supervisor transferred her to another area (Tr. 249). Although Plaintiff worked sporadically between January, 2000 and December, 2002, she reported that she was now back at work (Tr. 249). Plaintiff reported that she entertained friends at home and was able to perform activities of daily living (Tr. 250). Dr. Fenton noted that she exhibited good self esteem (Tr. 250). He noted that she was working on feelings of guilt in therapy (Tr. 250). Dr. Fenton noted that Plaintiff's physical history also included a cardiac condition (Tr. 251). Dr. Fenton assigned Plaintiff a GAF of 72[3] (Tr. 252). He found despite an obsessive/compulsive personality, she

---

[3] A GAF rating of 71–80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* ("*DSM–IV–TR*"), 34. DSM–IV–TR at 34.

-5-

was able to work without restriction (Tr. 253).

An April, 2003 independent orthopedic evaluation noted Plaintiff's report of "sudden onset of low back pain" on January 27, 2003 (Tr. 284). Plaintiff reported partial improvement in her condition since the onset (Tr. 284). A. Rayes, M.D. noted "no gait dysfunction or weakness" (Tr. 285). He found that she was unable to return to work for two weeks (Tr. 285). The following month and in June, 2003, Dr. Rayes found once again that Plaintiff was not able to return to work for two weeks (Tr. 281, 283).

In April, 2004, neurologist W. Boike, M.D. performed an independent physical examination, noting Plaintiff's report that "over time," the left leg pain had become "less prominent" but that she continued to experience "significant" right-sided low back pain (Tr. 299). Dr. Boike noted that Plaintiff declined a recommendation for steroid injections (Tr. 299). Plaintiff reported that she took Vicodin about once a week (Tr. 300). She reported otherwise excellent health (Tr. 300). Dr. Boike recommended steroid injections and additional physical therapy (Tr. 300). He imposed work restrictions of a 20 pound lifting limit and avoidance of "repetitive bending and twisting" (Tr. 300).

In June, 2004, Dr. Boike provided testimony in a Workers' Compensation proceeding, noting Plaintiff's reported that in February, 2003, she awoke with "severe low back pain" following a workplace "lifting episode" (Tr. 377). He noted that a "positive left straight leg raising sign" as demonstrated by Plaintiff in April, 2004 was consistent with "nerve root irritation" (Tr. 383). He opined that the disc herniation shown in the June, 2003 studies occurred "in either late January or early February of 2003" (Tr. 386). He reiterated that Plaintiff should not lift more than 20 pounds and should avoid repetitive bending and twisting (Tr. 387). He acknowledged that he examined Plaintiff at the request of her attorney and did not provide treatment (Tr. 387).

In August, 2004, D. Fink, M.D. performed an independent physical examination, noting Plaintiff's report of ongoing low back pain, left leg tingling, and limited bending and sitting (Tr. 304). Dr. Fink noted that Plaintiff had declined recommendations for surgery, opining that it was "unlikely" that further conservative treatment would improve her condition (Tr. 307). He found that Plaintiff was "better suited for a job position" with no lifting of more than 10 pounds on a repetitive basis, a sit/stand option, and avoidance of prolonged ambulation (Tr. 307). He noted that if surgery were successful, Plaintiff could return to work within three to six months (Tr. 307).

### C. Vocational Expert Testimony

VE Stephanee Leech classified Plaintiff's past relevant work as a fork lift operator as semiskilled and exertionally medium (exertionally heavy as performed)[4] (Tr. 61, 189). The ALJ then described a hypothetical individual of Plaintiff's age, educational level, and work experience:

> [T]his individual would be limited to light work. They could never perform push/pull. They could never operate foot controls with the left lower extremity. They could never climb ladders, ropes or scaffolds. They could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, crawl. They would have to avoid even moderate exposure to excessive vibration. They would have to avoid even moderate use of hazardous moving machinery. They would have to avoid all exposure to unprotected heights. Could that individual do the claimant's past work? (Tr. 62).

The VE testified that the above-limited hypothetical individual could not perform

---

[4] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

Plaintiff's past relevant work, but could perform the light, unskilled work of an office clerk (180,000 positions in the State national economy); reception and information clerk (120,000); and bench assembler (60,000) (Tr. 62). The VE testified that if the same individual were limited to sedentary, rather than light work, she could perform the (sedentary) jobs of office clerk (75,000); reception and information clerk (70,000); and assembler (50,000) (Tr. 63).

The VE testified that the need to be off task for 20 percent of the work day, the need to miss two days of work each month due to "doctor visits, symptoms" or medication side effects, or the need to elevate the legs to waist level throughout the workday would preclude all work (Tr. 63-64). The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") except for the testimony regarding being off task, elevation of the legs, and absenteeism which was based on her own professional experience (Tr. 64).

### D. The ALJ's Decision

ALJ Fallis noted that while Plaintiff was previously denied benefits through March 26, 2007, a copy of the decision had been destroyed, and therefore he would be determining whether Plaintiff was disabled from March 30, 2003 through the DLI of March 31, 2009 (Tr. 20, 34).

Citing the medical records from that period, the ALJ found that Plaintiff experienced the severe impairments of "degenerative disc disease of the lumbar spine; sciatica; and history of mitral valve prolapse" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 24-25). He found that the conditions of anxiety with panic attacks and obsessive-compulsive disorder ("OCD") did not cause more than minimal limitation in Plaintiff's ability to perform basic work activities, citing a consultative examination showing at most "transient" symptoms just prior to the

beginning of the relevant period (Tr. 24). He found that Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following restrictions:

> [S]he could never perform pushing or pulling; could never operate foot controls with the left lower extremity; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs; could occasionally balance, stoop, kneel, crouch, and crawl; would have to avoid even moderate exposure to excessive vibration; would have to avoid even moderate use of hazardous, moving machinery; and would have to avoid all exposure to unprotected heights (Tr. 26).

Citing the VE's testimony, the ALJ found that although Plaintiff was unable to perform her former work, she could work as an office clerk, reception/information clerk, and bench assembler (Tr. 33, 62).

The ALJ found that the medical records supported the finding that Plaintiff could work prior to the DLI of March 31, 2009 (Tr. 29). He noted that as of August, 2003, Plaintiff exhibited 4/5 strength in the left knee but otherwise 5/5 strength in the lower extremities (Tr. 28). The ALJ noted that the same examination showed a normal gait and good range of back motion (Tr. 28). He noted that Plaintiff declined a recommendation for surgery by stating that she did not want to go back to the type of work she was previously doing (Tr. 28). The ALJ cited Dr. Boike's April, 2004 findings of normal extremity strength with a reduced range of lumbar spine strength (Tr. 30).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### The Residual Functional Capacity

Plaintiff disputes the ALJ's finding that she was capable of exertionally light work. *Plaintiff's Brief,* 13-20, *Docket #13,* Pg ID 456. She argues first that the ALJ failed to provide a cogent rationale for discounting Dr. Callaway's multiple disability opinions. *Id.* at 13-14. Plaintiff also faults the ALJ's finding that the back condition did not preclude her from light work for a total of 12 months or more as required to show entitlement to DIB. *Id.* at 15-17; § 423(d)(1)(A). Last, Plaintiff contends that in providing a rationale for the RFC, the ALJ worked backwards from a predetermined conclusion of non-disability by citing only the portions of the record supporting the non-disability determination. *Id.* at 17-19. Plaintiff notes that she was over the age of 50 prior to the DLI of March 31, 2009. *Id.* at 17-18. As Plaintiff noted, at the time of the DLI, she would be categorized as an individual "closely approaching advanced age." 20 C.F.R. part 404, subpart P, App. 2, Rule 201.14. In the "closely approaching" age group (50 to 55), a finding that she was limited to exertionally sedentary, unskilled work would result in a disability finding. *Id.*

Defendant argues that "[a]s a threshold matter," Plaintiff's earlier claim for DIB resulted in a determination that she was not disabled through March 26, 2007. *Defendant's Brief,* 2, *Docket #14,* Pg ID 468; (Tr. 20). Defendant contends that while ALJ Fallis found that Plaintiff was not disabled from March 30, 2003 through the DLI of March 31, 2009, "he did not have the authority to reopen the decision more than four years after it became final." *Id.* Defendant argues that the conditions for reopening a prior determination are not present in this case. *Id.* Defendant notes that the medical transcript consists exclusively of evidence from the previously adjudicated period. *Id.* However, because none of Plaintiff's contentions provides grounds for remand, I decline to address Defendant's argument that the

ALJ erred by ruling on the previously adjudicated period.

### A. Dr. Callaway's Opinion

Plaintiff contends that the ALJ did not provide an adequate rationale for declining to adopt Dr. Callaway's disability opinions. Plaintiff is correct that for the period in question, the failure to articulate "good reasons" for rejecting a treating physician's opinion regarding a claimant's medical condition constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013). However, the record shows that the ALJ provide "good reasons" for not adopting Dr. Callaway's opinions. The ALJ acknowledged Dr. Callaway's December, 2002 finding that that Plaintiff was unable to lift more than 10 pounds, noting that he gave it "partial weight" by adopting it to the extent that he found that Plaintiff could lift 10 pounds frequently (Tr. 30, 214). He noted that he "otherwise" gave the December, 2002 opinion "little weight" because the restriction was unsupported by clinical findings (Tr. 30). More importantly, he noted that the December, 2002 work restrictions predated Plaintiff's alleged onset of disability date of March 30, 2003 by almost three months.[5] Notably, Plaintiff was able to return to work subsequent to December, 2002.

The ALJ also provided an adequate explanation for declining to finding that Dr. Callaway's multiple 2003 opinions that Plaintiff was unable to work on a short-term basis over a five-month period translated into a finding of disability under the Commissioner's definition. *See* § 423(d)(1)(A). The ALJ acknowledged that Dr. Callaway found in March, 2003 that Plaintiff was unable to work from February 27 to approximately March 27, 2003, then in a series of work excuses, found that Plaintiff was disabled between then and

---

[5]

While Plaintiff contends that the ALJ's accord of partial weight to one portion of Dr. Callaway's December, 2002 opinion and "little weight" to another was "confusing[]," the ALJ adequately explained his reasons for doing so.

September, 2003 (Tr. 30). The ALJ noted that the September, 2003 work excuse stating that Plaintiff could resume work in six weeks, read together with the earlier work excuses, could not be construed to state that Plaintiff was unable to work for 12 months or more as required to receive DIB (Tr. 30). These observations are consistent with my own review of the record showing that no work excuses were written after September, 2003. Accordingly, the ALJ's conclusions pertaining to Dr. Callaway's findings should remain undisturbed.

### B. The 12-Month Durational Requirement

On a related note, Plaintiff disputes the ALJ's finding that none of the work excuses issued by multiple sources between January and September, 2003 established disability for a period of 12 months or longer. *Plaintiff's Brief* at 15-17.

The ALJ's finding that the work restrictions/work excuses did not meet the 12-month durational requirement is well supported and explained. The ALJ noted that none of the work excuses could be interpreted to state that Plaintiff was incapable of exertionally light work from the alleged onset date of March 30, 2003 through the next 12 months. He cited a workplace nurse's finding that Plaintiff was restricted to lifting 10 pounds for two days in January, 2003 but pointed out (1) that the restriction did not meet the durational requirement and, (2) the finding was not supported by clinical findings (Tr. 30). He noted that while Dr. Rayes, a non-treating source, found that Plaintiff was unable to work from April to June, 2003, his findings that Plaintiff was unable to work for three months did not establish entitlement to DIB (Tr. 30, 281, 283-285). The ALJ also cited Dr. Levin's September, 2003 remark that Plaintiff should be "out of work several more weeks" and his work excuse for that month until January 30, 2004, but noted once again that the work excuse did not establish that Plaintiff was disabled until March 30, 2004 (Tr. 31, 217, 368).

Plaintiff's argument that the work excuses written between March and September,

2003 can be construed to state that she was unable to perform exertionally light work through March 30, 2004 fails for two reasons.  First, Plaintiff's assertion that in the absence of evidence showing disability for the entire period, the ALJ should rely on the earlier, short-term work excuses is unavailing. A claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).  Even crediting Dr. Levin's September, 2003 one-time examination conclusion that Plaintiff would be disabled through January, 2004, the record contains no evidence to suggest that Plaintiff was unable to perform a limited range of work subsequent to that date. To the contrary, substantial evidence otherwise supports the finding that Plaintiff was capable of a range of exertionally light work before March 30, 2004.  The ALJ cited Dr. Boike's April 7, 2004 finding that Plaintiff was capable of lifting 20 pounds with avoidance of repetitive bending and twisting[6] (Tr. 300).  The ALJ did not err in adopting Dr. Boike's findings (made only one week after the one-year anniversary the alleged onset of disability) over the other findings made at least eight months earlier.

### C.  The Weight Accorded the Various Sources

Finally, Plaintiff accuses the ALJ of adopting only the portions of the transcript supporting the finding that she could perform light work "so as to disqualify her from benefits . . . ." *Plaintiff's Brief* at 17-18.  In making this argument, Plaintiff again relies on the findings of the workplace nurse and Dr. Callaway who both imposed 10-pound lifting requirements.  Plaintiff also cites Dr. Fink's August, 2004 finding that she was limited to work limiting her to 10-pound lifting and avoidance of prolonged ambulation. *Id.*  She also

---

[6]Dr. Boike's findings that Plaintiff was capable of a range of light work are all the more credible given that he was hired by Plaintiff in conjunction with her Worker's Compensation claim (Tr. 300, 377-383, 387).

contends that the ALJ adopted only the portion of Dr. Boike's April, 2004 findings supporting the non-disability finding. *Id.*

As discussed above, the restriction to lifting 10 pounds for a total of three days by workplace nurse predates the alleged onset of disability. Likewise, Dr. Callaway's work excuses for the period between March and August, 2003 cannot be read to state that Plaintiff was unable to perform exertionally light work for 12 months (Tr. 212). While Plaintiff cites Dr. Fink's August, 2004 consultative conclusion that she was limited to sedentary work, the ALJ did not err by instead adopting Dr. Boike's finding that she could perform exertionally light work. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*)(Commissioner's findings not subject to reversal merely because substantial evidence exists in the record to support a different conclusion).

Plaintiff's argument that the ALJ only adopted the portions of Dr. Boike's opinion supporting the RFC is not well taken. Plaintiff faults the ALJ for failing to include Dr. Boike's preclusion on repetitive bending and twisting in the RFC and the finding that Dr. Boike's observations and conclusions were entitled to "partial weight to the extent they are consistent with the [RFC]" (Tr. 31). However, the ALJ's accord of only "partial weight" to Dr. Boike's opinion cannot be interpreted to state that the ALJ believed that Plaintiff required a lesser degree of restriction than found by Dr. Boike. To the contrary, the RFC found in the administrative opinion is notably more restrictive than Dr. Boike's assessment. The RFC restricts Plaintiff to occasional postural activity (climbing, balancing, stooping, kneeling, crouching, and crawling) with a preclusion on the use of ladders, ropes, or scaffolds; a preclusion on all pushing and pulling; and the imposition of significant environmental

limitations.[7] Because the RFC is notably more restrictive than Dr. Boike's finding that Plaintiff was limited to 20-pound lifting provided that she avoided repetitive bending and twisting, Plaintiff's claim that ALJ adopted only the portion of Dr. Boike's findings supporting the non-disability finding is without merit (Tr. 26, 300).

The ALJ also cited other portions of the record undermining the allegations of disability. Plaintiff's testimony that she was capable of walking for up to 40 minutes at a time during the relevant period (Tr. 58), coupled with observations of a normal gait as early as April, 2003 stands at odds with her present claim that she was unable to perform exertionally light work (Tr. 221, 285). Plaintiff's reluctance to follow through with recommended treatment also undermine her allegations of limitation. While her hesitancy to undergo back surgery is somewhat understandable, the record shows that she declined to follow through with multiple recommendations for the non-aggressive treatment of steroid injections (Tr. 299). In response to Dr. Jackson's statement that back surgery would "get her back to work," Plaintiff replied that she "really [did] not want to go back" to her previous work (Tr. 223). One week following the one-year anniversary of the alleged onset of disability, Plaintiff reported excellent health aside from the radiating (but gradually

---

[7] SSR 85-15 notes that the postural activity of kneeling is synonymous with the ability to "bend the legs alone;" stooping equates with "the ability to bend the spine alone;" and crouching equates with the ability to "bend both the spine and legs." 1985 WL 56857, at *2 (January 1, 1985). The ALJ found that Plaintiff was limited to occasional kneeling, stooping, crouching (Tr. 26). Plaintiff's claim that the RFC did not include Dr. Boike's preclusion on repetitive bending is therefore without merit. In Social Security parlance, occasional activity "means occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at *5–6 (January 1, 1983). Although the RFC does not contain a reference to avoidance of repetitive twisting, the ALJ cited Dr. Jackson's August, 2003 observation that Plaintiff experienced a good range of back motion (Tr. 221).

improving) back pain (Tr. 299).

Because the decision that Plaintiff was not disabled during the relevant period is within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Docket #14] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated:   August 21, 2018

                                             s/R. Steven Whalen
                                             R. STEVEN WHALEN
                                             UNITED STATES MAGISTRATE JUDGE

---

**CERTIFICATE OF SERVICE**

      I hereby certify on August 21, 2018 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to non-registered ECF participants on July 21, 2018.

                                             s/Sandra Osorio
                                             Acting Case Manager for the
                                             Honorable R. Steven Whalen